I see we've got multiple parties on each side, and you've split up your time, and that's fine. Just keep track among yourselves of how you're going to split that time up, so you'll get... I think they're over here. Yes. Yes, I see that. Twenty-twenty-five. All right. Please proceed.     Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. May it please the Court, my name is... My name is Jennifer Sackett-Holmans, and I represent Appellant Roxana Landfill, Inc. Since there are two appellants for sharing the 20-minute time frame, as we did with the briefs, we will also cover different arguments before Your Honors for judicial efficiency, and we join each other's oral arguments as well. As an initial matter, I would like to give you some factual background. Second, I'd like to address statutory construction. Third, I'm going to argue concerning Criteria 2, 4, and 6 that are against the manifest way to the evidence. And fourth, I discuss the fundamental unfairness of the hearing before the village of Caseyville. The law at issue is 415 ILCS 5-39.2. It's also known as the Siting Law or Section 39.2. The Siting Law sets forth nine criteria that a pollution control facility applicant must meet to get local siting approval. This is the only opportunity for public input. This is a very—nine criteria are technical in nature, and the local government's ability to make rulings on these technical criteria has been upheld since the law was passed. And this is a—on the next step, if approval is reached, is permitting in which no third parties have standing to participate in that process before the Illinois EPA, except the applicant and agency. In this case, the Pollution Control Board stunningly ruled against the plain language of Section 39.2 that a pollution control facility applicant need not provide evidence of the nine criteria in order to meet its burden of proof. Public commentary by a non-expert is sufficient under this decision. The Pollution Control Board's decision is the law now unless your honors reverse it, and it has turned siting upside down. For example, under this Pollution Control Board decision, I can walk into a willing host community and, without experts or evidence, say in a public comment, unsworn, that hydrology and engineering at a landfill I propose is sufficient to meet the siting criteria. Under this case, I need no testimony. I need no experts to meet these technically oriented nine criteria. And, to top it off, even in the face of expert testimony in opposition to my public comment, as long as I'm—the host of government agrees with me, my comment is infallible. It trumps even technical testimony that is subject to cross-examination. This is what happened with the Caseyville Transfer Station siting, which I'm also going to refer to the Caseyville Transfer Station as CTS. So why can't that happen with a landfill? They're both pollution control facilities, and no distinction is made under this law. Moving to the impact from the Pollution Control Board's decision with respect to statutory construction, it's twofold. In the first instance, the Pollution Control Board decision allows a document of legal consequence to be left with someone at Village Hall other than the Village Clerk's Office and consider that document to be filed under the custody and control of the Keeper of Records, in other words, the Village Clerk's Office, even if it isn't, and even if that Village Clerk's Office does not know whether or not that document is actually at Village Hall. In this case, the Pollution Control Board held that Seamson, Mr. Seamson, the owner of CTS, his delivery or submittal of his siting application to the Village Hall was equivalent to a filing with the Village Clerk. This is the Pollution Control Board's holding, even though it is not disputed that the Village Clerk's Office, whose official Keeper of Records for the Village of Caseyville, did not have custody or control of the CTS siting application before February 18, 2014, and certainly did not take possession of that siting application on February 10, 2014. This is inconsistent with Illinois Supreme Court's holding in Gettle and the Second District's holding in Wilkins concerning custody control of the Clerk's Office and what a filing is. Those are cited on page 8 of Roxanna's reply brief. Why is this important? Case law in Illinois until now has been unequivocal that a document isn't filed until it passes into the custody and control of the official Keeper of Records, in this case, the Village of Caseyville's Village Clerk Office. Also, the filing of a siting application on the day stated in its pre-filing notices is a jurisdictional requirement. Even a day early or a day late means that there's no jurisdiction and is sufficient to deny jurisdiction in the case. This Court's decision in BFI versus the Pollution Control Board, as well as other cases, such as Concerned Citizens versus Kane County Defenders, support this rule of law, and it was cited in Roxanna's opening brief on page 17. So, you have an applicant who sets forth a filing date, February 10th, and a Village Hall's Clerk's Office who doesn't receive custody or control until the 18th. There was an easy fix for this. CTS could have re-noticed, republished, sent out new pre-filing notices, picked a new filing date, and gotten it right. Instead, it asked this Court to rule that it made this mess, and you should overlook it. We saw Roxanna respectfully request the Court not reward CTS for making a mess that could have easily been rectified. Secondly, the second issue of statutory disruption concerns the Pollution Control Board's misinterpretation of the terms public hearing, evidence, factual evidence, and opportunities for cross-questioning, which are all used in Section 39.2. If the Pollution Control Board decision is upheld, then these terms, the supporting legislative history, over 30 years of case law and practice in Illinois, are rendered meaningless. There is not a single case in which citing application, local approval, has been upheld with no testimony and no evidence. I'm going to refer the Court to a case, the Splains Currency v. Joseph Knight, 29-2-244. It's an Illinois Supreme Court decision from 1963. It has a very nice description of how fundamental it is during an administrative hearing to be based on testimony, and the rationale, a testimony that's subject to cross-examination. And that is the rationale for restricting findings on the record to what has been developed in the record below.  The parties have an opportunity to cross-examine testimony provided by the petitioner or applicant, and have an opportunity to present evidence in response or rebuttal. Did your client have an opportunity to ask questions of the CPS witness? Not under oath, Your Honor. We had no opportunity, and we objected to that throughout the proceeding, that Mr. Seamson did not testify, was not placed under oath. He intended to proceed in the public hearing under public commentary, unsworn only, and therefore we were deprived of the opportunity to cross-examine him. Was a record made of his testimony? He didn't testify before the village. Was a record made of his statement? I believe the village attorney, John Gilbert, makes a statement that it's the applicant's decision to move forward, and if he doesn't make it in the public hearing, he certainly does when he testifies at the Pollution Control Board hearing. That is his decision to proceed in this manner. This is a situation where the local government had no citing ordinance, and so you defer only to what the statute says. And the statute says, public hearing, cross-questioning, evidence, and factual evidence. And those don't equate, in terms of the history of this law and common sense, that those would mean something other than what they mean in the ordinary sense, that they would be equivalent to just public, unsworn comment. I'm sorry. I think the Justice was asking about a record. Like, is there, maybe I misunderstood, but is there testimony, is there something written down? Is there a bystander's record? Yes, there are objections about Mr. Seamson not being under oath. But is Mr. Seamson's testimony, everything that he says, in the record? He did not testify before the village board, but his public comment is before the village board. The fact that it's not under oath is before the village board. The two witnesses that did testify under oath are also in that transcript before the village board. So there was some testimony under oath. Of Roxanna Landfill, presented a Criterion 6 and Criterion 2 expert, Mr. Dustin Reitman, he's a traffic engineer. He was your expert. Correct. And the village of Fairmont City presented an expert as well who testified under oath, subject to cross-examination. There was no other testimony. Okay. Thank you. Just to follow up on that, did you question the CTS witness with the idea, even though he's not under oath and it's not testimony, he's making a statement, was he questioned so that those points could be made by way of asking him questions, the village board members? I don't believe that those points could be made unless someone is under oath. And I think it attributes weight where weight shouldn't be attributed to what he has to say. It's a public comment. And as an unsworn public comment should be weighed separately as testimony and should not be equated to it. So would that be a matter of weight then? I mean, it seems like you could ask questions and make your points. And even though it's not sworn testimony, the board can weigh that statement. I don't think you can make your point unless you're subject to cross-examination. I don't think that, I think we're deprived and potentially the argument is in the way that our objection with respect to him not being sworn. And I wasn't going to risk waiving objection to get answers that I didn't know what the veracity of them were. It made no sense and you didn't know, it provided no evidence to just have argument, essentially attorney argument, which Mr. Simpson is an attorney. It's essentially, you know, your opening statement in a public hearing, nothing more. So you didn't take the opportunity to ask questions because you thought you would waive your objection? I thought I would waive my objection and I didn't see, for example, I wouldn't ask questions during someone's opening statement in a trial. I understand, but that's why you didn't ask the questions. I wanted to preserve my objection and I felt it was fundamentally unfair. I didn't think that answers I get would mean anything on the record. Okay. So the Pollution Control Board has actually adopted that displaced currency case that I referenced in North Shore Sanitary District versus Pollution Control Board at 2 Illinois at 3D797. There is not a single case in which a site and local approval has been upheld based on no testimony, no evidence on behalf of the applicant. And with this decision, the Pollution Control Board has effectively built an express way over public participation. Moving on to the criteria, manifest way that the evidence applies to all the criteria except for 8, in which part of the argument, and Mr. Moran will be covering Criterion 8, part of the argument concerns de novo review. Criterion 2 of the Illinois Environmental Section 39.2 provides that the facility is so designed, located, and proposed to be operated that the public health, safety, and welfare will be protected. Criterion 6, and one of the aspects of that is the design of on-site traffic flow. Criterion 6, on the other hand, concerns off-site traffic flows. In terms of on-site traffic flow, CTS presented no design with respect to basic things such as ingress and egress of its facility or on-site flow of the traffic. These are critical components of that portion of Criterion 2. Likewise, it failed to present any evidence concerning Criterion, to meet Criterion 6 or concerning Criterion 6, which is traffic patterns to or from a facility are so designed to minimize impact on existing traffic flows. Since no existing traffic flow data is contained in the application by CTS, and Mr. Seaman's public commentary for CTS did not reference existing traffic flows, how can that criteria be met? Mr. Reichman testifies as to this and many other deficiencies such as queuing issues off-site, railroad track crossing in the immediate vicinity of the proposed transfer station, and the school peak traffic hours from the school down the street being in conflict with the peak hours of the proposed transfer station. That school's a head start school. It's a program with 224 children between the ages of 2 and 5. Without such details, CTS, I submit, cannot have met a primary patient case under Criterion 2 and 6. Further, the only reference to Criterion 4, which is that the facility is not in a flood plain or is flood proof, is Mr. Seaman's public comment referencing the firm map and the firm map being in the application. I submit that the meekest reef of Pantene does a very nice job discussing the history of Criterion 4, the evidence that's necessary, and I defer that discussion and argument to that reef. A firm map in an application does not alone meet this criteria. Finally, on fundamental fairness, I would submit Fairmont City's reply brief does an excellent job reviewing the case while explaining how reducing an adjudicatory process to a public comment and not requiring our citing applicants to testify and be subject to cross-questioning violates our standard of due process for these cases. Thank you, Your Honor. One moment. What about the motion to strike the amicus briefs? Yes, Your Honor. The motion to strike the amicus briefs is not with respect to Pantene Township. It was brought only with respect to the three counties, and I believe one of the bases of that, and I'll let Mr. Moran respond to that as well if you don't mind, was that the counties could have had an opportunity to participate in this process. The reality is the counties make the plan. It's a plan that goes through a very public process, a public hearing, and it's developed pursuant to state law. Those are reviewed and appropriately reviewed in their amicus brief. There is no requirement that they attend. By making a plan, a government entity is publishing what it wants, so they don't have a burden and shouldn't be required to attend each and every citing. The applicant should actually be the entity to come to the planner and say, Hey, here's a plan that you made, and I don't see anywhere you reference a transfer station. Can we talk about what your intent was with that plan? And that wasn't ever done. Okay. Thank you very much. Thank you, Your Honor. May it please the Court, my name is Donald Moran. I am appearing on behalf of the Village of Fairmont City. I will address in my remarks three of the statutory criteria, Criterion 1, Criterion 3, and Criterion 8, and also the Pollution Control Board's review of this record with respect to those criteria. The PCB's decision affirming the approval of the Village of Caseyville should be reversed because the applicant here, Caseyville Transfer Station, did not make its prima facie case of demonstrating compliance with those criteria. Even putting aside the moment that this applicant presented no sworn testimony, and assuming that were sworn testimony, the evidence it presented was insufficient to demonstrate that Criterion 1 on need, Criterion 3 on minimizing effect on property value, and Criterion 8, demonstrating consistency with the County Solid Waste Plan, was satisfied. Section 39.2 requires that an applicant, and I'm quoting, submit sufficient details describing the proposed facility to demonstrate compliance with each of the statutory criteria. This language bears close review. It indicates that what must be submitted are sufficient details, not general information, not oral, unsworn public comment, but specific details that demonstrate or prove compliance with those criteria. The case law has established the standards that must be addressed in order for these criteria to be met. This applicant's unsworn statements did not address those specific standards. Let me address Criterion 1. Criterion 1 requires the applicant to demonstrate that the facility is necessary to accommodate the waste needs of the area it is intended to serve. Again, the language, necessary to accommodate the waste needs of the service area. What does that mean in terms of a transfer station, which is what was proposed here? Well, the function of a transfer station is to allow the consolidation of waste from a given area so that economies of scale and savings in transportation costs from bringing that waste from the transfer station to a landfill can be achieved. So the emphasis and the purpose of a transfer station is to achieve these savings in transportation costs, wear and tear of the roads, and other benefits that could be obtained whereas there wouldn't be the possibility of direct haul from the generators of this waste to landfills either within a service area or outside a service area. So to establish the need for a transfer station, it's absolutely critical to evaluate the available disposal capacity within a service area. In other words, are there sufficient landfills with sufficient disposal capacity so that the waste generated within a service area can be brought to these landfills? Only in the event that there were not that sufficient capacity do transfer stations make sense or would transfer stations be needed. Because in that instance, the service area would have a need for... Thank you, counsel. You'll have the opportunity for rebuttal. And again, you guys get 20 minutes. I don't care how you split it up, but you've got to measure your own time is the point I was making. It's up to you. Thank you. Thank you. Arguments for the appellees? Please report. My name is Valerie Quinn. I'm here on behalf of... You're going to have to speak up, please. Always. May it please the Court, my name is Valerie Quinn, and I'm here on behalf of the Pollution Control Board, Your Honors. And that doesn't amplify your voice. It does. It just records it. Oh, okay. Yeah, just speak up. So, very quickly, the standard of review on factual findings. The Pollution Control Board reviewed the villages' factual findings to determine whether they were against the manifest weight of the evidence. And in order to find that a factual finding is against the manifest weight of the evidence, you'd have to pretty much conclude that no rational fact finder could come out the same way that the village did. That's what the PCB does, and then this Court reviews the PCB's factual findings. Basically, the PCB's decision, using the same standards, kind of double manifest weight standard. With respect to the filing... I want to ask you one question before you, as you get into your argument. You keep using the Pollution Control Board, use the evidence. How do you define the word evidence here? Are we talking about public comment is evidence or sworn testimony is evidence? Your Honor, under Section 39.2, everything is evidence. The public comment is evidence and the village was required to consider it. The application was evidence. Anything anybody said at the hearing was evidence. How can an application be evidence without testimony supporting it? The statute does not require a testimony under oath. What the statute refers to is an opportunity for public comment, for people to submit anything they wish to. It includes, and in fact the village is required to consider, even written comments, letters, technical reports, anything received within 30 days after the hearing, all of that under Section 39.2 is evidence and the village is required to consider every bit of it. And it did in this case. Okay, so as you go through your argument and you talk about evidence, you're talking about the whole... I'm talking about the entire picture. Constellation. Everything in the box that the court now has. Thank you. With respect to the filing date, the Pollution Control Board's factual finding, based on the undisputed evidence that the application was delivered to the village, submitted to the village, on February 10, 2014, was not against the manifest weight of the evidence. And the Pollution Control Board's ultimate determination that that application was timely was not clearly erroneous. Roxanne is essentially arguing for a knowledge requirement. A document isn't filed until the clerk knows he has it. If it's in Rob's office but he doesn't know it's there, then it isn't filed. That's not a workable standard. Not in a small village like Caseyville and surely not in a large urban area. You know, when does Dorothy Brown, the clerk for the Circuit Court of Cook County, when does she know that she's got a document? It's an unworkable standard. Black's Law Dictionary puts it, a document is filed when it's delivered to the clerk's office for placement in the official record. That's what Mr. Simpson did on February 10, 2014, and nothing indicates otherwise. With respect to the issue of cross-examination and fundamental fairness, Roxanne and Fairmont City do not have a life, liberty, or property interest at stake in these proceedings, so they do not get a guarantee of constitutional due process. What they got under the statute is the assurance of fundamental fairness. The statute does not require testimony under oath or cross-examination. It's a quasi-legislative, quasi-adjudicatory proceeding designed to ensure unbiased decision-making. The legislature was fully aware that it was putting citing proceedings in the hands of non-judges, into the hands of local legislative bodies that do not, as a general rule, conduct formal hearings. So the General Assembly made the procedures more relaxed and dispensed with the strict requirements that you would find in a trial or in an adjudicatory hearing in front of an administrative agency. And besides, the General Assembly is assumed to know what it's talking about. So in Section 39.2, it provided for cross-questioning. In Section 32, which is the enforcement hearings provision, there it provides for cross-examination. And courts will presume that the General Assembly meant, said in the statute what it meant, and meant in the statute what it said, especially where there is no ambiguity. So there's no need to reach for legislative history to figure out what's going on here. The purpose of legislative history is to resolve ambiguity, not to create it. Not only was the village not required to place Mr. Simpson under oath before he spoke, and yes, the transcript has his remarks. It's got everything in it. Not only was the village not required to place him under oath, you know, they chose not to cross-question him. If questioning him under oath was so important, one wonders, why didn't they call him in their case as an adverse witness? Because then they could have cross-examined him under oath all evening. This was a choice. The record is full of evidence that can't be cross-examined. Well, whose burden is it? I mean, you can't ask somebody who doesn't have the burden to meet your burden, if it's your burden, or not your burden, but the municipality's burden. Is it really fair to argue that, well, somebody else could have called him in cross-examination? They chose not to question him, and that is... But you're talking burdens. You don't really want to place the burden on them. No, it's not a burden, but it's obviously a tactical choice. They could have questioned him just like everybody else questioned him. Everybody at the hearing was questioning him, and he answered all their questions. It's, you know, why didn't they do it? And that's all I'm saying. If under oath was so important, there was this other option. In any event, Your Honor, the record is full of documentary evidence that can't be cross-examined, and that includes Fairmont City's late-filed affidavit from Dallas Alley. I mean, under their logic, since it can't be cross-examined, it's not evidence, and its presence in the record is unfair. That's not how this works. Public comment is evidence. Quickly, with respect to Section 22.14, that's the 1,000-foot setback from property that's zoned as residential. That wasn't raised at the hearing. It was raised 26 days later during the post-hearing comment period. The setback under 22.14 is not one of the nine siting criteria under Section 32. 39.2, I'm going to get that number right. In fact, 39.2G explicitly excludes local zoning provisions from consideration by the local siting authority. This is the first step in a much longer process. Third, what would the purpose be of a provision prohibiting a pollution control facility from going in near land that's been zoned residential? Well, that would be to keep it from being put near somebody's house or land that was going to have somebody's house on it, which is clearly not the parcels at issue in this case. Those have been permanently restricted from development. And in any event, whether the existence of 22.14 had any bearing on, say, compatibility under Criterion 3, that, again, is an issue of fact. The village resolved in CTS's favor. With respect to Criterion 3, as the 4th District explained in Tate and the 3rd District explained in Fairview, the inquiry on this criterion is kind of a two-step process. If there's no showing of incompatibility, and there was never showing that CTS is compatible with the other uses down there, near its property is vacant land, some of which can never be developed, trucking facilities, inquiring, sanitation facilities. There is no incompatibility, and no one has shown it. So there was no evidence that minimization was required. There is obviously no incompatibility. Finally, Your Honors, very quickly with respect to the Solid Waste Management Plan, it is one of the nine criteria. And whether or not it is consistent, if the facility is consistent with the Solid Waste Management Plan, that, again, is a question of fact for the village, whose finding on it will not be overturned unless it was against the manifest way of the evidence. And with all due respect to the prosecutors who drafted the amicus brief, they were not involved in the process of drafting the plan, and they have not a shred of specialized knowledge to offer about it or what it was meant to exclude. They admit they are merely applying general principles of statutory construction. For example, their brief at page 6. And that's a fun academic exercise. You know, we all love statutory construction. It's point, counterpoint. But in the end, this was a matter that the village resolved in the transfer station's favor, and the pollution control's affirmance of the village's decision should itself be affirmed. And unless there are questions, I would like to leave the balancing of time for Ms. Livingston. All right. In opening remarks, Ms. Polans told this court that she didn't take the opportunity to ask questions and that she wouldn't ask questions in opening at trial. And yet if you look at the transcript, you'll see from Fairmont's appendix at 8113 that after Mr. Seamson has started his statement, she says, Excuse me, Mr. Mayor, I just want to know if this is an opening statement, and do I get to have an opening statement too? And Mr. Gilbert, the attorney for the village, says, Well, everybody who wants to say anything will be heard, will hear from anybody. He says, You'll be able to make whatever presentation you believe is appropriate, and any of the other persons or entities who wish to be heard will be able to make any presentation in whatever nature they desire, which would also mean that you could ask questions of the applicants, as the mayor of Washington Park did. Kathy Mertzke asked 17 questions, as pointed out in the brief. They did have an issue at one point. Was she properly served? Yes, she was. She's there asking questions. At any rate, they are told you can do this any way you want to do this. They don't live in Caseyville. They don't have a business in Caseyville. They're competitors. You know, what is their interest here? Their interest is not a property right, so on the fundamental fairness issue, they are not entitled to due process of law. They say that they didn't have a right in their brief on page 8. They say, Well, we didn't have a right to cross-examine an adverse witness. The fact that they're calling him an adverse witness shows you didn't call him as an adverse witness. If you want to ask questions, Mr. Moran goes into, Hey, we should have been able to cross-examine. Well, the mayor says, Well, what do you want to do now? I say, Well, I have a witness I want to call. Okay, call your witness. Ms. Livingston, what about this sworn testimony? What about the formality of the public hearing? You would agree that there was a lack of formality. Well, and that's how it works with small villages sometimes. They didn't even have a local ordinance to deal with this kind of an issue. They have a lawyer. Right, they have a lawyer, Mr. Gilbert. If you look at Section 39.2, what it says is, An applicant for local siting approval shall submit sufficient details describing the proposed facility to demonstrate compliance. Mr. Seamson submitted four binders, and I list in my brief all of the things that he puts in there, all the maps, all of the diagrams, everything that he has. It's like 1,500 pages. And then he explains what his 1,500 pages are about. And just so you will see, Ms. Polantz says she doesn't ask questions. But on A127, this is in Fairmont's appendix, you see that Mr. Seamson is talking about fire protection and how he's got these procedures that are consistent with the National Fire Protection Agency and the fire marshal. And Ms. Polantz says, Is that contained in the application? And Mr. Seamson says, No, it's not. And she says, I would object to that since it isn't in the application. So she's treating it like the application is the Bible of what this would be, and does the application have it in it. And the next page, Mr. Seamson is talking about a Mr. Jim Fields from the highway department who he has consulted with, and Mr. Fields writes him a letter. And, in fact, in the Pollution Control Board decision itself, on page 33, it goes into great detail about James Fields' letter. And it says, basically, he says, Well, St. Clair County has to complete plans for reconstruction on Buncombe Road to 157, and we recommend that the existing weight restriction would be lifted if that road was improved. He says, You know, Mr. Seamson, you're going to need a traffic study before you put your entrance in. So when it comes time for getting Illinois EPA approval of the permit, he's also going to have to get permission from St. Clair County as to how his entrance is, and he's going to have to do a traffic study at that point, or he's not going to get his facility. So the issue was minimizing traffic impacts. But the point I'm making is that he's sitting there and he says, Yeah, I've got this letter from Jim Fields that I just got. I want to tell you about it, and here's about the proposed entrance. And this is on A-128, Ms. Polance. Same objection, not being part of the application. So then she presents evidence and her own person, and on A-152 of Fairmont's appendix, what do you see? She's asking her traffic guy questions, and he says, I did meet with the highway engineer, Jim Fields. I also met with Norm Miller, who is adamantly opposed and asks lots of questions of Mr. Seamson. Mr. Seamson may not have raised his right hand to swear to tell the truth, but he did tell the truth. And he was there. They had access to him. You know, if the county board had taken public comments and we had all come in to oppose a landfill and we had brought in technical studies from New York about groundwater contamination, that public comment, even though it was not sworn testimony, could be considered by the county board or the village board to say, you know what, I think there's a danger of groundwater contamination from the way you did your liner at this landfill. We're not going to let you be here. And that would be their prerogative, their discretion, even though that's a public comment, not subject to cross-examination. In fact, I cite a Fifth District case from this court in 97, can't think of the name of it, but where this court said we're not going to say that you had to cross-examine the author of an expert report in order for that to have been considered. So even though Ms. Polanski is saying, well, I wouldn't have interrupted opening, she does interrupt opening. She does ask questions. In fact, Mr. Moran asked several questions in the record. I can give you the pages to those. So they are saying, oh, excuse me, is this about this? They know how to open their mouth and ask questions. They're in a superior position. They do local citing all over the state of Illinois. This is Mr. Seamson, former attorney, former environmental consultant, decides he wants to be an entrepreneur, looks at the situation and says, hey, I could consolidate waste here. I could help people get cheaper garbage bills, consolidate the waste, ship it to, you know, they say Perry County, ship it to an hour county where the tipping fees are lower, the taxes are lower, the tipping fee tax, and you can then not fill the landfill capacity that we have in St. Clair County and our landfills will last longer and we won't need another landfill in our county for another 20 years, according to Ms. Cheryl Smith's testimony, which when you look at the intent of the law and the intent of looking at the needs analysis, the intent is to make sure that there's landfill capacity so that you have a place to put your garbage. And it was also intended to, you know, you've got to meet the criteria, but it was also intended and the county plans were intended to make sure that we account for the landfill capacity that we'll need to grow as a society. We need to put our waste somewhere. So why do we have so many objectives? Well, because... If the policy is a good one. If the policy... If the intent of your client is a good one. Well, at every landfill hearing there are lots of opposers as well. Of course, at landfills you have... Why are these municipalities opposing? Well, Washington Park came and opposed it. I think Mr. Sneeson had first gone there. They had some concerns they raised. The mayor effectively asked her questions. I think she asked about vectors maybe, you know. Yeah, but what's the bottom line? Why are they opposing if it frees up landfill space? I think the county and the cities are opposing it, particularly Fairmont and St. Clair, because if the waste goes to Perry County, then they will not get their tipping fee. Our tipping fee fund currently has probably $4 million in it. It's how my salary was paid for eight years. It's out of that tipping fee fund. That's how the health department is funded. And so the solid waste purpose of the money of the tipping fee is expended by the county to the extent that you ship it to another county. That county gets that money. So I would think that that's why they're opposed. I'm certain that's why Fairmont is opposed. Okay. What about this Jim Fields letter? I mean, obviously, this is not going to be approved until there is a study. Exactly. Just like this facility can never be put there unless Mr. Simpson first obtains a permit from Illinois EPA, who is going to look at all kinds of factors, including the factors that were looked at here, the spill prevention plan, the fire prevention plan. Are you protective of health, safety, and welfare? And so the county is going to look at the ingress, egress, and the redoing of Buncombe Road. And they're saying, you're going to have to have a check study before you can put that in. Okay, well, he'll go get one. Just like he'll go get an Illinois EPA permit. They won't give a permit if it won't protect the public health. Is an application complete then without this study? I mean, as a matter of consequence, if Jim Fields doesn't approve this, this isn't going to happen. Then it won't happen. And that will be on Mr. Simpson. So is this really a complete application with the opportunity to look at all the factors if, in fact, you don't have a study? All right, so they deposed, I think Mr. Abernathy or one of the other village board members, and at the deposition, and I'm sure this is in the record, he said, you know, we know the traffic in that area. We know that the road needs to be replaced, and we know what traffic we can handle. And you're talking about less than a mile to get to 157, less than a mile to get to 64. We think that the traffic can handle it. What does that have to do with Jim Fields? He's the superintendent of highways. Okay, well, the issue is, has Mr. Simpson shown that his facility will minimize the effects on the traffic patterns in that area? And from common knowledge, there isn't that much traffic in that area. Okay, but the reality of life is that Mr. Fields is the one who will make that decision. Exactly, and that's why he's consulted. Your people can't make that decision. Well, if you look at the letter from Mr. Fields, and you look at the citation from the Pollution Control Board on page 33, what they say is, Mr. Fields states, and that's in the appendix 33 of- I've got it. Okay, and he says, Mr. Fields states the traffic study shall be required, and that the study will outline possible steps to mitigate, if any, the negative impacts. It is, therefore, reasonable to wait and perform a traffic study that accounts for this change in the surrounding roadways. I should have read up above where he talks about how the roadway is being replaced. So if it's being replaced, what's the point of doing the study right now? You're going to have to do it and show that when that roadway is the way it's going to be, that you're not going to impact traffic patterns. Will that require another hearing once Mr. Fields' report is in? I think that Mr. Fields gets to decide unilaterally if he thinks the ingress and egress minimizes traffic, and if it doesn't, he won't approve it. Then the facility won't be there. Okay. Thank you, counsel. Thank you. A local siting hearing is an adjudication. It's not an informal proceeding. That principle was established in 1983 in the second district decision of E&E Hall. As an adjudicatory proceeding, the case law has been consistent throughout. Procedural due process rights apply. Those are fundamental fairness standards. Those standards include the right to cross-examine adverse witnesses. The Pollution Control Board simply ignored that controlling precedent in this case. Well, is it true that it has to be under oath, as I think Justice Schwarm started this out? Indeed. If we look at the language in Section 39.2, and I pointed that language out earlier, where it says the applicant must submit sufficient details to demonstrate compliance, the only reference in 39.2 to the submission of any written comment is in Section 39.2C, which says any person may submit a written comment within 30 days of the last day of the public hearing. It says nothing in the Act regarding anyone's ability to make oral, unsworn comment at a siting hearing. It only allows for any person, presumably an applicant, any objector, to submit a written comment up to 30 days after the public hearing. Nothing authorizes or says that unsworn statements can be given at a siting hearing. The practice, as it's developed since 1981 when this Act went into effect, and I've been doing this for that long, for better or worse, has been to allow individuals, members of the public, to give unsworn statements if they chose. Frankly, I don't know the legal basis for that, but that's been the practice. And apparently here it morphed into the applicant being able to present unsworn statements in support of its application. I've been involved in over 35 of these hearings. I have never seen that done by any applicant. They've always presented some form of sworn testimony. Is this court really wasting its time with this appeal? And I say that because let's suppose that we affirm the circuit court. As a practical matter, if Jim Fields decides that this isn't going to happen, it's not going to happen. Well, indeed, the applicant still has to get a permit from the Illinois Environmental Protection Agency. But that doesn't take away from the fact that this site approval decision is critical because without this approval, those steps and those considerations can never be undertaken. Those allocations can never be made. And if the agency ultimately grants a permit, and if Mr. Fields decides, well, this looks okay, we'll go forward, then of course this court's review would not be for naught. It would be very critical. But it seems like we're kind of premature in that we don't know what Mr. Fields is going to do. So if we affirm the decision, we still leave it in the hands of the St. Clark County Department of Roads and Bridges. But it still would establish significant precedent that would be applied in future cases for applicants seeking siting approval and with the body of jurisprudence that's grown up around this body of law. So the formality of what happened is a really significant issue then. Very significant, and also the Pollution Control Board's review here was not consistent with what our Supreme Court ordered the Pollution Control Board to undertake in conducting these reviews. Here, the Pollution Control Board did not apply the proper standard of review in looking at Criterion 1. Criterion 1 requires an applicant to establish and to point to the waste production in a service area, the disposal capacity in a service area, to determine whether there's a need for a transfer station to provide access to the service area for distant landfills. Here, there was sufficient capacity at existing landfills where this transfer station was needed. The Pollution Control Board ignored it. With respect to Criterion 3, there's two parts of Criterion 3. Located so as to minimize incompatibility and minimized so as to minimize any effect on value of surrounding property. This applicant presented no information at all with respect to property value. Didn't even attempt to address the second prong of Criterion 3. And with respect to Criterion 8, the legal standard is there must be a determination as to the intent of the county as expressed in the language of the plan. That was not done here. The applicant presented no information evaluating the intent of the plan and then determining whether this proposal was consistent. The Pollution Control Board, in its review, did not apply the proper standard of review, which is a de novo review of that determination of intent. The Pollution Control Board ignored it entirely and allowed this decision to stand. As such, this decision of the Pollution Control Board is against the manifest way of the evidence and we respectfully request that it be reversed. Thank you. Thank you, counsel. Thank you for your well-written briefs and your argument that we'll take this case under advisement and issue a written ruling. We're going to take a short recess before we call the 10 o'clock case issue. And I say short, you know, it's probably going to be 10 minutes. You can count on that, but we'll be back short. Court will be in recess. All rise.